The ASSOCIATED PRESS, Appellant,

v.

Edwin A. WALKER, Appellee.

No. 16624.

Court of Civil Appeals of Texas.

Fort Worth.

July 30, 1965.

Rehearing Denied Sept. 17, 1965.

Cantey, Hanger, Gooch, Cravens & Scarborough, and J. A. Gooch, Carlisle Cravens, and Sloan B. Blair, Fort Worth, for appellant.

Looney, Watts, Looney, Nichols & Johnson, Oklahoma City, Okl., Andress, Woodgate, Richards & Condos and Wm. Andress, Jr., Dallas, for appellee.

PER CURIAM.

This is a libel suit. The parties will be designated as they were in the court below or The Associated Press as the A. P. and Walker by name.

The following are the reports of which Walker complained:

"October 2, 1962 'Walker, who Sunday night led a charge of students against federal marshals on the Ole Miss Campus, was arrested on four counts including insurrection against the United States.'

"October 3, 1962 (Editors Note: Former Maj. Gen. Edwin A. Walker, a key figure in the week-end battling over admission of a Negro to the University of Mississippi, was eating dinner Sunday night when he says he was told there was a 'scene of considerable disturbance' on the University of Mississippi Campus. He went there. Here is the story of Van Savell, 21, Associated Press newsman, who was on the scene and saw what happened.)

"By Van Savell: Oxford, Miss., October 3, 1962 (AP) 'Utilizing my youth to the fullest extent, I dressed as any college student would and easily milled among the several thousand rioters on the University of Mississippi Campus Sunday night.

" 'This allowed me to follow the crowd— a few students and many outsiders—as

they charged federal marshals surrounding the century old Lyceum Building. It also brought me into direct contact with former Army Maj. Gen. Edwin A. Walker, who is now under arrest on charges of inciting insurrection and seditious conspiracy.

" 'Walker first appeared in the riot area at 8:45 p. m., Sunday near the University Avenue entrance about 300 yds. from the Ole Miss Administration Building.

" 'He was nattily dressed in a black suit, tie and shoes and wore a light tan hat.

" 'The crowd welcomed Walker, although this was the man who commanded the 101st Airborne Division during the 1957 school integration riots at Little Rock, Arkansas.

" 'One unidentified man queried Walker as he approached the group. "General, will you lead us to the steps?"

" 'I observed Walker as he loosened his tie and shirt and nodded "Yes" without speaking. He then conferred with a group of about 15 persons who appeared to be the riot leaders.

" 'The crowd took full advantage of the near-by construction work. They broke new bricks into several pieces, took survey sticks and broken soft drink bottles.

" 'Walker assumed command of the crowd, which I estimated at 1,000 but was delayed for several minutes when a neatly dressed, portly man of about 45 approached the group. He conferred with Walker for several minutes and then joined a group near the front.

" 'Two men took Walker by the arms and they headed for the Lyceum and the federal marshals. Throughout this time, I was less than six feet from Walker.

" 'This march toward tear gas and some 200 marshals was more effective than the previous attempts. Although Walker was unarmed, the crowd said this was the moral support they needed.

" 'We were met with a heavy barrage of tear gas about 75 yards from the Lyceum steps and went a few feet further when we had to turn back.

" 'Before doing so, many of the rioters hurled their weapons—the bricks, the bottles, rocks and wooden stakes—toward the clustered marshals.

" 'We fled the tear gas and the charging marshals—the crowd racing back to a Confederate soldier's statue near the grove entrance below the Lyceum.

" 'I went to a telephone. A few minutes later I returned and found Walker talking with several students. Shortly thereafter, Walker climbed halfway up the Confederate monument and addressed the crowd.

" 'I heard Walker say that Gov. Barnett had betrayed the People of Mississippi. "But don't let up now," he said, "You may lose this battle, but you will have been heard."

" 'He continued: "This is a dangerous situation. You must be prepared for possible death. If you are not, go home now."

" 'There were cheers. It was apparent that Walker had complete command over the group.

" 'By this time, it was nearly 11:00 p. m. and I raced to the telephone again. Upon my return, Walker was calmly explaining the "New Frontier Government" to several bystanders. He remained away from the rioting throughout the next few hours, but advised on several tactics.

" 'One Ole Miss student queried the former General, "What can we use to make the tear gas bombs ineffective? Do you know of any way that we can attack and do some damage to those damn Marshals?"

" 'Walker suggested the use of sand to snuff out the tear gas.

" ' "This stuff works real well, but where can you get it?", he asked.

" 'At this time the rioters were using a University fire truck and fire extinguishers in an attempt to make the tear gas bombs ineffective.

" 'I left Walker and walked about 100 yards away where Molotov cocktails—gasoline, in bottles with a fuse—were being made.

" 'Again I left the area for a telephone. As I walked toward a Dormitory with George Bartsch of the Little Rock Associated Press Bureau, we were attacked by Marshals who mistook us for students. We were deluged by tear gas, manhandled, handcuffed and beaten with clubs during a 200 yard walk back to the Lyceum Building.

" 'Thanks to recognition from Chief Marshal James P. McShane, we were quickly released and given freedom in the Marshals' Headquarters.

" 'Within minutes rifle and shotgun fire erupted from the rioting crowd and two men—one a French newsman—were killed. We considered ourselves lucky to have been arrested and glad to be behind closed, heavily guarded doors.' "

The only two statements of the above quoted reports which were complained of by Walker as being libelous and which form the basis of special issues submitted by the Court were: (1) "Walker, who Sunday led a charge of students against federal marshals on the Ole Miss Campus" (October 2, 1962 report), and (2) "Walker assumed command of the crowd" (October 3, 1962 report). For the sake of brevity these two statements will hereinafter be referred to as the "charge" and "command" statements respectively.

In answer to special issues one through four, the jury found that the "charge" statement was not "substantially true", did not constitute fair comment, was not made in good faith and was actuated by malice. It found to the same effect in response to similar issues five through eight concerning the "command" statement.

In answer to issue No. 9 the jury found damages in the sum of $500,000.00 and having found that A. P. was actuated by malice in answer to special issues Nos. four and eight the jury, in response to special issues Nos. ten and eleven found that exemplary damages should be awarded and in the amount of $300,000.00.

Based upon the verdict of the jury, judgment was entered for Walker and against the A. P. in the sum of $500,000. The judgment recited that there is no evidence to support the jury's findings of malice and $300,000 for exemplary damages.

Appellant contends that the court erred in rendering judgment for appellee rather than it because (1) as a matter of law the evidence conclusively established that the "charge" and "command" statements were substantially true; (2) each statement was a fair comment about a matter of public concern published for general information and thus privileged under the provisions of Art. 5432, Vernon's Ann.Civ.St.; (3) such statements made without malice are protected by the First and Fourteenth Amendments to the Constitution of the United States; (4) over objection appellee was permitted to testify that he did not assume command; (5) it held as a matter of law that the "charge" and "command" statements were libelous rather than submitting issues as to each; (6) the evidence conclusively established as a matter of law that the "charge" and "command" statements were made in good faith with reference to matters it had a duty to report to its members and thence to the public; (7) the amount of damages found was so grossly excessive as to be patently wrong and unjust and the findings in response to the damage issue No. 9 and to special issues one, two, three, five, six and seven are so against the weight and preponderance of the evidence as to be manifestly wrong and unjust and thus insufficient to support such answers; and (8) the evidence conclusively established as a matter of law that the jury was guilty of material

misconduct which probably resulted in injury to the defendant.

We affirm.

### Evidence

In discussing the points relating to the quantity and quality of the evidence we have examined the complaints of the appellant in the light of the Article by Chief Justice Robert W. Calvert entitled, " 'No Evidence' and 'Insufficient Evidence' Points of Error", 38 Tex.Law Rev. 361 and authorities therein cited.

The evidence considered in its most favorable light in support of the findings of the jury and the judgment of the court is in essence as follows: At approximately 4:00 P. M. of the day in question, a ring of Federal marshals had encircled the Lyceum Building. Walker arrived on the campus about 8:45 P. M. At that time a loud, violent riot was in progress in an area of the campus known as the Circle. A crowd assembled in the Circle area, began taunting and jeering the marshals. By 8:00 P. M. a full scale riot had erupted which was to continue all night, destroy 16 automobiles, kill two people, injure 50. The rioters would form into groups and charge toward the marshals, throwing bricks, bottles, rocks, sticks and other missiles. The rioters attempted to charge the marshals with a fire truck and then with a bulldozer. "Molotov cocktails" were hurled at the marshals. Finally rifle fire erupted. The next morning the campus looked like a battlefield. Soon after his arrival, Walker, after some urging to say a few words, spoke from the steps of the Confederate Monument. While there is some dispute as to what he said, there is testimony that he told the assembled groups that while they had a right to protest that violence was not the answer. He was "booed" or "jeered" at this time and again when urging a cessation of violence. He and others walked in the direction of the Lyceum Building where the marshals were stationed but he never came closer to the marshals than the monument or the

length of a football field. He was there to watch what happened. He wanted a peaceful demonstration as a protest. His presence there was not illegal or unlawful. He had the same right to come upon the campus and observe the activity as did the various members of the press who were there to observe and to report. He was one of the crowd. He was not in the forefront, never in front of the crowd. He never hurled any rock, brick or other missile in the direction of the marshals or otherwise. He did not participate in the riot. He never directed or suggested that others do so. He issued no directions nor did he counsel or suggest to others that they charge the marshals or take any other offensive action toward them. The crowd was disorganized. It was a leaderless group. Groups were milling aimlessly. No one, including Walker, made any effort to assume leadership. Walker did not run. He never got out of a slow walk, described as strolling, ambling, or "moseying" along. He never participated in the riot or violence in any manner. He made no effort to incite or move others to action or violence. When asked how to drive the marshals out, he said: "You don't."

Throughout the trial Walker maintained the firm position that because of his opposition to the use of Federal troops within a State, and his personal knowledge of the deviation between the occurrences at Little Rock where he was indeed in command and the newspaper stories of those occurrences, that he was at Oxford to see for himself at firsthand what was actually going on. He maintained that he did not assume command of the crowd, did not lead a charge, and did not participate in the rioting. He was present for the sole purpose of observing. The jury saw him, observed his demeanor, heard what he said, and believed him.

" 'No evidence' points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only

evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact." 38 Tex.Law Review, pp. 361, 362, supra.

■ Subdivisions (a) and (b) above have no application to the record or the facts in this case. As to (c) we have viewed the evidence in its most favorable light in support of the findings of the jury upon which the judgment of the Court is based, considering only the evidence and the inferences which support the findings and rejecting the evidence and the inferences which are contrary to the findings. In the application of this test we have determined that all of the findings of the jury, upon which the Court based its judgment, are supported by ample evidence. Having reached this conclusion it follows that we find no merit in the appellant's contention that the evidence establishes conclusively the opposite of what the jury found. We find that none of the situations discussed by Judge Calvert under (a), (b), (c) or (d) is disclosed by the record. Further we have concluded from our study and examination of the entire record that the findings of the jury upon which the Court based its judgment is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong or unjust.

■ Jurors are the exclusive judges of the controverted issues of fact raised by the evidence, of the weight to be given the evidence, and the inferences to be drawn therefrom. They are the exclusive judges of the credibility of the witnesses. "The law does not attempt to tell jurors what amount or kind of evidence ought to produce a belief in their minds. They may believe a witness although he has been contradicted. They may believe the testimony of one witness and reject the testimony of other witnesses. They may accept part of the testimony of one witness and disregard the remainder." McCormick & Ray, Texas Law of Evidence, § 3; Austin

Fire Ins. Co. v. Adams-Childers Co., 246 S.W. 365 (Tex.Com.App., 1923).

"The mere fact that a verdict is against the preponderance of the evidence will not authorize a reviewing court to set it aside, if there is some evidence to support it, or evidence that would support a verdict either way. The court of civil appeals will set aside the verdict and findings of a jury only in cases where they are so against such a preponderance of the evidence as to be manifestly unjust or clearly wrong, or where they show clearly that the finding or verdict was the result of passion, prejudice, or improper motive, or in such obvious conflict with the justice of the case as to render it unconscionable." 4 Tex.Jur.2d, p. 395, § 838, and authorities cited therein.

"Where evidence is conflicting, a reviewing court will not disturb the jury's verdict or findings if there is evidence of probative value to support them, unless the evidence is so overwhelmingly against the verdict or findings as to shock the conscience or show clearly that the conclusion reached was wrong or was the result of passion, prejudice or improper motive.

"The findings on conflicting evidence are usually regarded as 'conclusive,' 'binding,' or 'decisive,' and will be 'adopted' or 'accepted' as the findings of the appellate court, unless some good reason is presented that would justify the court in taking some other view.

"A jury finding on facts will not be set aside because it does not appear to be clearly right; it must appear to be clearly wrong before the appellate court will disturb it.

"The fact that the appellate court would not have found as the jury did is not the test to be applied on appeal. The true test is that made by the jury, on firsthand evidence, adduced before them from living witnesses whose credibility and the weight to be given their testimony were determinable by the jury. Where the jury's findings are in accord with the testimony of different disinterested witnesses, the fact

that there is other testimony to the contrary does not authorize the appellate court to overturn the verdict. * * *" 4 Tex.Jur. 2d 390, § 837, and authorities cited therein.

In the application of the rules of law and the authorities above referred to, we overrule all points of error relating to the quantity or quality of the evidence supporting the findings of the jury upon which the Court based its judgment.

■ We find no error on the part of the Court in permitting Walker to testify that he did not assume command of the crowd.

He testified that he became a professional soldier upon completing four years at West Point in 1931 when he was commissioned as a Second Lieutenant. He had combat experience in the Mediterranean, European and Asiatic Theatres during World War II and in Korea. He finally attained the rank of Major General. During the course of the trial Walker testified on several occasions without objection that during the Little Rock matter he took command of the troops, was assigned as commander or that the troops were under his command. In connection with the occasion in question at Ole Miss he was asked if he, "participated in any way in any activity of the crowd that was throwing things at the Marshals?" He answered without objection that he had not participated in any way. He was then asked if he assumed "any command over this crowd." Objection was made on the ground that the answer would be a conclusion on the part of the witness. The Court permitted Walker to answer and he stated, "I certainly did not," and in response to another question he answered without objection that he certainly knew what it meant to assume command. The news item in question had identified Walker as the former Major General who commanded the 101st Airborne Division at Little Rock followed by the statement, "Walker assumed command of the crowd."

The Article in question stated as a fact that Walker had "assumed command of the crowd." We think that Walker, subject of this remark, had the right to deny or affirm the truth of it. We think that the opinion in Goode v. Ramey, 48 S.W.2d 719 (El Paso Civ.App., 1932, refused), is applicable. Therein it was stated, "We are not prepared to say under the record, as presented here, that it was error to admit the statement of the witness. The issue sought to be proved was not a mixed question of law and fact, but purely a fact question. We think the issue was one upon which a witness in possession of all the facts may properly state his opinion or conclusion to which such facts would fairly lead, notwithstanding the witness' answer may embrace the very issue to be submitted to the jury. The conclusion of the witness is then testified to like any other fact to be considered by the jury for what they may believe it to be worth. Scalf v. Collin County, 80 Tex. 514, 16 S.W. 314; Adkins-Polk Co. v. John Barkley & Co. (Tex.Civ.App.) 297 S.W. 757; International & G. N. R. Co. v. Mills, 34 Tex.Civ.App. 127, 78 S.W. 11."

■ If we are mistaken in holding that the testimony of Walker was admissible we nevertheless overrule the point of error because we are of the opinion that the error, if any, in admitting the testimony, was harmless within the meaning of Rules 434 and 503, Texas Rules of Civil Procedure; Dallas Railway & Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379 (1952).

### Fair Comment

■ The appellant contends that the "charge" and "command" statements constituted fair comment and thus were privileged under the provisions of Art. 5432, V.A. C.S. We find and hold that both the "charge" and the "command" statements were statements of fact and not of comment. *"Walker, who Sunday night led a charge of students against federal marshals * *"* and *"Walker assumed command of the crowd * * *"*, (emphasis added) are positive statements of fact. Truth of the

statements would constitute a complete defense. Appellant failed in its effort to establish this defense to the satisfaction of the jury which found that neither of the statements were substantially true.

In an article on "Fair Comment" by John E. Hallen, 8 Tex. Law Review 41 (1929-30), the author in discussing Art. 5432, V.A.C.S., states: "The 1927 Libel Law provides:

" 'The publications of the following matters by any newspaper or periodical shall be deemed privileged and shall not be made the basis of any action for libel * * *.

" '4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information.'

"Paragraph 4 was in no way changed by the 1927 amendments and has appeared exactly in that form since 1901.

" * * * the right of fair comment was not created by the statute. It is well recognized by the common law. Every one has the right to comment on matters of public interest and general concern and within limits is not liable for stating his real opinion on such subjects, however severe the criticism may be. It is immaterial whether or not the criticism is sound, or whether the court or jury would agree with it, so long as it represents the honest opinion of the speaker upon a matter of recognized public interest.

"The statute expressly declares that fair comment by newspapers and periodicals is privileged. But since this right was enjoyed by everyone at common law, the statute gives the newspaper no added privileges. Nor is it to be construed as taking away the common law defense of individuals. * * * (p. 41)

"It should be remembered that there is a distinction between comment or criticism, which is the opinion of the speaker or writer upon certain facts, and the facts upon which that opinion is based. A misstatement of fact cannot ordinarily be justified by a plea of fair comment. * * * (p. 43)

"It has already been said that fair comment is a criticism, discussion, or expression of opinion upon existing facts and does not protect against a misstatement of the facts themselves. The question of what should be called fact and what comment is difficult. * * *" (p. 53)

"Texas has swung from its early holding in the Copeland Case (Express Printing Co. v. Copeland, 64 Tex. 354 (1885) that an untrue charge of crime, honestly and reasonably made, about a public officer, is privileged, to its present position that such a charge cannot be justified by a newspaper. In following its present doctrine Texas is supported by the weight of authority, and there are strong reasons for its holding." (p. 99)

An article under the heading of "Libel and Slander—Fair Comment—Statements of Opinion" by Tom J. Mays appears in 16 Tex. Law Review 87 (1937-38). He commences with, "A judicial warning to the press with respect to comment and criticism upon matters of public interest is discernable in the recent decision of Houston Printing Co. v. Hunter." 105 S.W.2d 312 (Fort Worth Civ.App., 1937), affirmed, 129 Tex. 652, 106 S.W.2d 1043 (1937). The article continues, "That fair comment and criticism upon such matters is qualifiedly privileged is quite generally recognized both at common law and in Texas by statute. On the other hand, where false allegations of fact are made regarding matters of public concern, the courts are not in accord. Perhaps a majority of the courts hold that false allegations of fact are not entitled to immunity even though made in good faith and without malice. * * * Texas is clearly in line with the majority, holding that falsification of the facts is never privileged.

"Although the distinction between statements of fact and statements of opinion or comment has been freely recognized, it is

generally conceded that distinguishing the two becomes a difficult problem in many cases." (p. 88)

"Most of the cases, it seems, wherein the words are held actionable as statements of fact, have found imputation of malfeasance, misconduct, or corruption in office, or imputations of evil or corrupt motives in the administration of duties. These being treated as statements of fact, then certainly a false imputation of crime committed by a public officer or candidate would be actionable as a statement of fact in Texas. (pp. 89–90)

\* \* \* \* \* \*

"It is manifest that some method is needed by which to distinguish between statements of fact and comment; and it is equally certain that no absolute test can be laid down. But it is submitted that more desirable and satisfactory results can be reached." (p. 90)

The author suggests the following test by which to distinguish statements of fact from comment, "Where the statement alleged to be libelous can be reasonably construed by the reader as an expression of opinion only, on the basis of facts either already known to the reader or else reasonably assumed by the person writing the statement to be known to the reader, then it should be regarded as fair comment. Where, however, the statement alleged to be libelous, as reasonably construed, conveys to the reader not only an expression of the writer's opinion, but also certain supposed information, and this information conveyed does not accord with the true facts, it is not comment, but should be treated as a statement of fact. ·

"Under this test, whether a publication will be treated as a statement of fact and libelous, if untrue, will depend upon the surrounding circumstances of each particular case. Under such a guidance, even an imputation of crime might be held to be merely an expression of opinion and not actionable." (p. 91)

In, "The Press and the Law in Texas" by Norris G. Davis, University of Texas Press, Austin, 1956, it is stated that, "\* \* the right of fair comment is a weak defense in most libel suits. It is subject to so many limitations that it is seldom completely applicable. There are three groups of limitations. First, the comment must be limited to matters of public concern. Second, the article must be a statement of opinion—or comment—rather than a statement of fact, a very difficult distinction to make. Finally, the comment must be reasonable and fair and made in good faith, and this limitation is also difficult to define." (p. 65)

"Even if the subject matter and the person concerned are clearly matters of public concern, there remains two severe limitations. One of these, the requirement that the story or article must be comment, not a statement of fact, has caused by far the most trouble. The separation of comment from factual statements in most stories and articles is extremely difficult, and Court decisions have shown confusion on the point." (p. 67) "One important rule developed for separation of fact and comment is the theory that imputation of dishonest motives to a public official or imputation of an act constituting a crime under the law is a statement of fact and cannot be considered fair comment." (p. 68) San Antonio Light Pub. Co. v. Lewy, 52 Tex.Civ.App. 22, 113 S.W. 574 (1908, Ref.); Forke v. Homann, 14 Tex.Civ.App. 670, 39 S.W. 210 (1896, ref.). The author in reference to the article by Mays in 16 Tex. Law Review 87 (1937–38), states: "One writer who has studied the fair-comment cases in Texas and has found the same confusion illustrated here has offered the following definitions of 'opinion statements' and 'fact statements.'" (p. 73) He then quotes the test suggested by Mays and continues: "Certainly the courts should become aware of the need to distinguish statements of fact from opinion on a less arbitrary basis than is now customary. If the Supreme Court would adopt such a defini-

tion as the one quoted above, it would do much toward creating such an awareness. Actual differentiation of fact and opinion would still be difficult, but court decisions would be more just. (p. 74)

"Actually, it is clear that almost any story, editorial, or other type of news article must be a mixture of statements of fact and comment, even though the writer attempts to confine himself to comment. Any type of comment, in implication at least, must be based on fact; and newsmen know that the most effective comment is that based on startling and important statements of fact. Newsmen should therefore be prepared to prove the truth of any statement of fact and to rely on fair comment as defense only for the conclusions drawn from these true facts. They should strongly urge the courts also to make the distinction between fact and opinion rather than, as they so often do, plead all defenses to all parts of a story alleged to be libelous." (p. 74)

In our opinion the test suggested by Mr. Mays and favorably commented on by Mr. Davis is a good one. We think that its application to the facts in this case support our holding that the statements involved were statements of fact and that the appellant was not prepared to prove the truth of either statement. The information conveyed was not in accord with the true facts. Reference is made to the complete text of the articles above referred to and the authorities cited therein. See also 36 Tex.Jur. 2d, Libel and Slander, §§ 87, 89, 92 and 171 together with cases cited under each.

■ We find no merit in appellant's contention that the reports, made without malice, are protected from the claim of libel by the First and Fourteenth Amendments to the United States Constitution. These Amendments prohibit Congress from making laws abridging freedom of speech and of the press and the State from making or enforcing laws of similar nature.

"The interest of the public in obtaining information about public affairs and of the defendant in discussing such matters is often brought directly in conflict with the plaintiff's claim to his own good name, and the law must draw a line between them. * * * (8 Tex.Law Rev. 41, p. 98)

"It is not true that false and derogatory statements about a man's character are today always actionable. If they were, the whole defence of privilege would be swept away. Nor is it true that everything may be justified under a defence of free speech or press. These rights as embodied in constitutions and statutes, were designed primarily to prevent interference by the government with a man's talking or writing, and not to do away with responsibility for what was said. If 'Freedom of the Press' always furnished a complete defense there could be no such tort as libel. * * * *" (8 Tex.Law Rev. 56)

"It is submitted that any decision based entirely upon the right to an inviolate character or freedom of speech is unsound. Either doctrine given full sway would annihilate the other. * * * * " (8 Tex.Law Rev. 61)

"Articles 5430, 5431, 5432, and 5433, Vernon's Texas Civil Statutes, 1948, clearly declare the policy of this State regarding the question of libel. The law protects the right of a citizen to defend his reputation and good name from libelous publications, and this right is zealously guarded. Bell Pub. Co. v. Garrett Engineering Co., 141 Tex. 51, 170 S.W.2d 197; Belo & Co. v. Looney, 112 Tex. 160, 246 S.W. 777; Express Pub. Co. v. Keeran, Tex.Com.App., 284 S.W. 913." Fitzjarrald v. Panhandle Pub. Co., 149 Tex. 87, 228 S.W.2d 499, 503 (Tex.Sup., 1950).

We find no application of the authorities cited by the appellant to the facts of this case.

### Libelous Per Se

■ Did the Court commit error in holding as a matter of law that the "charge" and "command" statements were libelous

per se, rather than to submit same to the jury for its determination? We think not. The language contained in the statements is not ambiguous. There can be no doubt as to the meaning of either.

■ Each of the statements imputed to Walker the crime of insurrection against the United States. It is undisputed that the crowd on the Ole Miss Campus was engaged in rioting and by force interfering with the efforts of U. S. marshals to enforce an executive order of the President of the United States issued under sanction of law and of applicable statutes. Insurrection is punishable by fine or imprisonment or both.

The statements further imputed to Walker responsibility for the death of two men and of the wanton destruction of property, all accomplished by students and others under his leadership and direction. The onslaught of the riotous crowd "led" by Walker who had "assumed command" was such that Van Savell considered he was, "lucky to have been arrested and glad to be behind closed, heavily guarded doors."

It imputed that Walker, who "advised on several tactics," none of which were ever specified, directed or advised on the making and use of the molotov cocktails (gasoline bombs) and other offensive weapons used by the rioters.

"The court should construe the meaning of unambiguous language, pass on its defamatory character, and instruct the jury accordingly. But where the language is ambiguous or of doubtful meaning there is a question for the jury." 36 Tex.Jur.2d 496, § 166; p. 482, § 156 of the same text and cases cited under each. Fitzjarrald v. Panhandle Pub. Co., supra.

"To charge a person with or impute to him the commission of any crime for which punishment by imprisonment in jail or the penitentiary may be imposed is slanderous or libelous per se." 36 Tex.Jur.2d 288, § 7; H. O. Merren & Co. v. A. H. Belo Corp., D.C., 228 F.Supp. 515.

"Any written or printed language tending to degrade a person in the estimation of honorable people, or imputing to him disgraceful or dishonorable acts, is libelous per se." 36 Tex.Jur.2d 297, § 13.

"The language claimed to be defamatory must be taken as a whole. Thus, a newspaper article must be considered in its entirety in determining the sense in which its language is used, and whether the article, or a particular statement therein, is libelous." 36 Tex.Jur.2d 313, § 27.

" '[L]ibelous per se' means that written or printed words are so obviously hurtful to person aggrieved by them that they require no proof of their injurious character to make them actionable." Rawlins v. McKee, 327 S.W.2d 633 (Texarkana Civ.App., 1959, ref., n. r. e.).

"Defamatory language may be actionable per se, that is, in itself, or may be actionable per quod, that is, only on allegation and proof of special damages. The distinction is based on a rule of evidence, the difference between them lying in the proof of the resulting injury. Language that necessarily, in fact or by a presumption of evidence, causes injury to a person to whom it refers is actionable per se. In other words, the defamatory words must be of such a nature that the court can presume as a matter of law that they will tend to disgrace and degrade the person or hold him up to public hatred, contempt, or ridicule, or cause him to be shunned and avoided. Where the language is actionable per se damages are conclusively presumed and need not be proved." 36 Tex.Jur.2d 280, § 2.

"To be libelous a publication must be defamatory in its nature, and must tend to injure or impeach the reputation of the person claimed to have been libeled. The language used, taken in connection with the facts and circumstances alleged by way of innuendo, must be reasonably calculated to produce one or more of the results mentioned in the statutory definition; that is, it must have the effect of injuring or tending to injure the person to whom it refers to

the extent of exposing him to public hatred, contempt, ridicule, or financial injury, or to impeach his honesty, integrity, or virtue.

"It is not necessary, however, that the language have all the injurious or pernicious tendencies enumerated in the statute; it is actionable if it has any of them. * *

"A publication that tends to subject the plaintiff to public contempt, or that impeaches his integrity or reputation, is libelous though it does not charge him with a crime.

"The term 'public hatred,' as found in the statutory definition, signifies public or general dislike or antipathy." 36 Tex.Jur. 2d 285, § 6.

### Damages

In connection with special issue No. 9 the jury was instructed that it may take into consideration such damages, if any, to the reputation of the plaintiff and such mental anguish, if any, and humiliation, if any, and embarrassment, if any, which plaintiff may have sustained as a direct and proximate result of the statements inquired about. The jury awarded $500,000.00.

 From our investigation and study of the record we are unable to find any legal justification to disturb the award of damages. If any improper influences were present they do not appear from the record. Under the pleadings the appellee sought damages, including exemplary damages, in the sum of $2,000,000.

"Mental suffering on the part of the person defamed is one of the direct results of a libel or slander. Accordingly, injury to the feelings, humiliation, and anguish of mind are proper elements of compensatory damages, provided they are the direct and proximate result of the defamation. This suffering is classed as general damages, that are presumed to have been sustained, and that, in actions for libel, are recoverable under a general averment, without specific proof that they were incurred, and, by virtue of statute, regardless of whether there was any other injury or damage, even though the publication was not libelous per se." 36 Tex.Jur.2d 402, § 98.

"The plaintiff is entitled to compensation for injury to his character or reputation caused by the defamation. * * * It follows that the jury, in fixing the amount of recovery, may consider the loss of, or injury to, character or reputation, even though there is no proof thereof nor any proof of good character. * * *" 36 Tex.Jur.2d 400, § 97.

"In other words, a general allegation of damages will admit evidence of those damages naturally and necessarily resulting from the defamation charged. It is unnecessary to itemize the elements of general damages; rather, the amount may be alleged in the aggregate. Thus, the plaintiff need not aver the nature, character or extent of the mental suffering caused, or even that he thereby suffered any agony, but it is sufficient to aver the damages he sustained by reason thereof. * * *" 36 Tex.Jur.2d 445, § 126.

"Generally speaking, the damages resulting from a libel or slander are purely personal and cannot be measured by any fixed standard or rule. The amount to be awarded rests largely in the discretion of the jury, or the court in a case tried without a jury, and an appellate court will not disturb the verdict or award unless it appears from the record to be excessive or the result of passion, prejudice, or other improper influence. * * *

"In fixing the amount the jury may take into consideration the motives of the defendant, and the mode and extent of publication. * * *" 36 Tex.Jur.2d 405, § 102.

### Exemplary Damages

By counter-points the appellee contends the court erred in setting aside the findings of the jury in response to special issues Nos. 4, 8, 10 and 11, which related to malice and exemplary damages.

Issues Nos. 4 and 8 inquired if appellant was actuated by malice, and malice was defined, "you are instructed that by the term 'malice' is meant ill will, bad or evil motive, or that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person to be affected by it."

■ The appellee had the burden of proving that the appellant's act or acts were such as to fall within the above definition before he was entitled to a finding of malice and exemplary damages.

The statement of facts consists of eleven volumes and 2126 pages. The entire record has received our close and sustained attention.

■ In view of all the surrounding circumstances, the rapid and confused occurrence of events on the occasion in question, and in the light of all the evidence, we hold that appellee failed to prove malice as defined, and the trial court was correct in setting aside said findings.

We think there is yet· another reason to support the Court's action in disregarding the jury's answers to the issue relating to malice and exemplary damages, namely, the lack of necessary pleadings and proof required under the holdings in Western Union Tel. Co. v. Brown, 58 Tex. 170 (1882); Wortham-Carter Pub. Co. v. Littlepage, 223 S.W. 1043, p. 1046 (Fort Worth Civ.App., 1920, no writ hist.), and Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W. 2d 397 (1934).

The record leaves some doubt as to whether A. P. is an incorporated or an unincorporated association. It does appear, however, that its composition, the manner in which it functions, and its organizational set-up is more akin to a corporation than not and that the holdings in the above cited cases would be applicable.

We think the record in this case will support our view. Certainly, A. P. is not an individual. Having no mind and being an entity only by a fiction of law, it must be held incapable of entertaining actual or express malice unless the requirements of the holdings in Fort Worth Elevators Co. v. Russell, Western Union Tel. Co. v. Brown and Wortham-Carter Publishing Co. v. Littlepage, supra, are complied with. A. P. is referred to as a corporation in the appellee's brief.

### Jury Misconduct

We find no error in the action of the Court in overruling the appellant's amended motion for new trial because of alleged misconduct of the jury.

During a general discussion of the case a juror remarked that the A. P. (or news media generally) was always hurting someone by the printing of false or malicious reports or words to this effect. There was considerable discrepancy in the testimony of the five jurors called to testify on the motion for new trial as to whether the reference was to the A. P. or to news media generally. It was a casual statement. "Nobody made any comment at all" about it. It is undisputed that it was quickly dropped. Who made the statement, which jurors or how many probably heard it or specifically at what stage in the proceedings the statement was made was not shown. It was dropped and not again mentioned. The jury discussed and answered the issues in order. They were 11 to 1 on the issues preceding those relating to malice and exemplary damages. While discussing these issues a remark was made that the full amount should be awarded because the A. P. had plenty of money and it was mentioned "about the Georgia football coach (Wally Butts) collecting." The jurors were in dispute as to whether the statement concerning Butts was ever made. It is without dispute that the statements, if any, were made after the jury had already found damages in the sum of $500,-000 and were considering the issues on malice and exemplary damages.

The juror who was the last to agree on the $500,000 was the juror who stopped the discussion as to how much money the Press had. He pointed out that it did not make any difference and was out of order. The matter was promptly dropped. The only answers which could have been influenced or affected by such statements, if any, were those to the issues on malice and exemplary damages, and these findings of the jury were disregarded by the Court on other grounds in the rendition of judgment.

In order to justify a new trial under Rule 327, T.R.C.P., the movant has the burden of establishing to the satisfaction of the Court that it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted by reason of the alleged jury misconduct. The appellant failed to meet its burden under this rule.

The trial court in its findings of fact and conclusions of law found that none of the statements singly or collectively induced any juror to change an answer or vote differently than he would otherwise have done. That there was no showing of probable injury to the appellant because of such statements.

"When a trial court hears the testimony of jurors on an issue of misconduct, alleged to have occurred during the jury's deliberation upon its verdict, he is accorded the same latitude in passing upon the credibility of the witnesses and of the weight to be given to their testimony as the jury had upon the trial of the original cause. If there be any inconsistencies or contradictions in the testimony of a witness upon the hearing of a motion for new trial, it rests within the sound discretion of the trial court to harmonize and reconcile such conflicts so far as possible. A juror's testimony upon such hearing may be so contradictory and inconsistent that the trial court in exercising its privilege to pass upon the credibility of the witness may be justified in disregarding his entire testimony. Carl Construction Co. v. Bain, 235 Ky. 833, 32 S.W.(2d) 414." Monkey Grip Rubber Co. v. Walton, 122 Tex. 185, 53 S.W.2d 770 (1932).

In our opinion the alleged improper statements, when viewed in the light of the evidence on the motion for new trial and on the trial of the case and on the record as a whole, did not probably result in injury to defendant. Rules 327 and 434, T.R.C.P.

Having considered each of the appellant's points of error and the cross-points raised by the appellee and having concluded that each should be they are each and all accordingly overruled, and the judgment of the trial court is affirmed.